Filed 8/4/26  Aleci v. McMillan CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| LINDA ALECI et al., | B325724 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. 18STPB08364) |
| v. | |
| DENISE McMILLAN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Aviva K. Bobb, Referee.  (Pursuant to Code Civ. Proc., § 638.)  Affirmed.

The Law Offices of John A. Schlaff and John A. Schlaff for Defendant and Appellant.

Lagerloff, Jamie N. Gonzalez, and Kevin W. Yang for Plaintiffs and Respondents.

_____

Appellant Denise McMillan is the sister of respondents Linda Aleci and Robert Klinger.[1]  The three siblings are co-trustees of the Klinger Family Trust, established by their parents.  In the proceedings below, a court-appointed referee ordered that: (1) the Trust reimburse Rob $16,241.28 for personal funds he expended on behalf of the Trust; (2) the Trust pay $2,206.62 to Clear Home Solutions (CHS) for services CHS performed for the Trust; and (3) Denise pay Linda and Rob $15,000 for attorneys' fees for fees they incurred bringing a motion requesting the first two orders.

On appeal, Denise does not argue the referee erred by finding that Rob incurred expenses on behalf of the Trust, that CHS performed uncompensated services for the Trust, or that Linda and Rob incurred attorneys' fees litigating against Denise. Instead, she contends the referee erred in ordering the Trust or her to pay anyone, because all the payees were guilty of "unclean hands," and because the payments contravened the parties' settlement agreement.  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    *The Settlement Agreement*

In September 2018, Linda and Rob filed a petition for instructions, alleging that, despite their best efforts, Denise was hindering the administration of their deceased parents' trust, of which all three siblings were co-trustees and beneficiaries. Respondents asked the court to order the three to begin the process of settling the Trust's affairs.  In February 2019,

_____

[1] Because the parties refer to themselves as Denise, Linda, and Rob, we follow suit.

2

respondents amended the petition and, in April 2019, filed a supplement to the amended petition, asking the court to remove Denise as a co-trustee due to malfeasance. Denise opposed the request. In October 2019, Denise filed her own petition, requesting the court remove Linda and Rob as co-trustees and order them to provide an accounting.

On June 17, 2021, the parties entered into a Settlement Agreement and Release. As relevant to this appeal:

Paragraph 5 of the agreement provided that "Rob shall receive reimbursement from the Trust for Trust expenditures that he personally paid out of pocket on behalf of the Trust in the amount of $60,931. Rob shall be reimbursed for these expenses prior to the distributions of any sums of Trust residue to any Party. No other Party shall be entitled to reimbursement of any amounts." Paragraph 6 of the agreement provided that Rob would "receive trustee fees in the amount of $70,500 to be paid by the Trust. Rob shall receive these trustee fees prior to the distributions of any sums of Trust residue to any Party. No other Party shall receive any trustee fees."

Paragraph 8 of the agreement provided that "[t]he Parties shall keep a reserve of $10,000 to be used for Trust accounting fees (but not to pay taxes) and any other remaining Trust administration expenses."

Paragraph 9 of the agreement provided that "[t]he Parties agree to work cooperatively to instruct Logix Credit Union, LPL Investments, and Bank of America to unfreeze all Trust accounts such that the sums described in this Agreement can be paid and the distributions can be made."

Paragraph 10 of the agreement provided that, after real property owned by the Trust (the "Burbank Residence") was sold

3

and various fees and reimbursements paid, the trust assets would be distributed equally among Denise, Linda, and Rob.

Paragraph 17 of the agreement provided that any disputes regarding the interpretation or enforcement of the agreement would be submitted to the Honorable Aviva K. Bobb (ret.) for mediation.

Paragraph 21 of the agreement provided: "In the case of any dispute relating to the terms of this Agreement or its enforcement, the prevailing party shall be reimbursed by the losing party for its reasonable attorneys' fees and costs."

**B.** *The Addendum*

On November 29, 2021, the parties entered into an Addendum to Settlement Agreement and Release. Paragraph 2 of the Addendum provided that "Clear Home Solutions" would engage in a "clean out process" for the Burbank Residence, as well as "pack up the items to be distributed to the beneficiaries," if any beneficiary asked it to.

Paragraph 5 of the Addendum modified paragraph 9 of the Settlement Agreement (providing the parties would cooperate to unfreeze the Trust's bank accounts to make payments and distributions) to add "[u]pon written authorization of the Parties' counsel, any one or more of the Co-Trustees shall be authorized to issue checks to pay Trust administration expenses. Each Co-Trustee shall confer with the other Co-Trustees prior to issuing any such check, either directly or through counsel."

Paragraph 6 of the Addendum deleted paragraph 17 of the Settlement Agreement (agreeing to submit disputes to Judge Bobb for mediation) and instead provided that the parties would stipulate to appoint Judge Bobb as a referee pursuant to Code of

4

Civil Procedure section 638 to resolve any disputes arising out of the Agreement and Addendum.

## C.  *The Parties Request Appointment of a Referee*

On the same day the parties signed the Addendum, they also stipulated to the appointment of Judge Bobb to serve as referee to determine "All disputes arising from the June 17, 2021 Settlement Agreement and Release and the November 29, 2021 Addendum to Settlement Agreement and Release."  The parties expressly agreed Judge Bobb could "Determine any and all disputes arising out of the Agreement and Addendum (the 'Disputes')"; "Issue binding orders determining the resolution of any and all Disputes"; "Determine if it is appropriate to designate a prevailing party(ies) relating to each of the Disputes and if a sanction is appropriate to be awarded to the prevailing party(ies)"; and "Issue binding orders determining the prevailing party(ies) relating to each of the Disputes and awarding a sanction."  In January 2022, the court appointed Judge Bobb to serve as referee.

## D.  *Respondents Move to Enforce the Settlement*

### 1.  **The Dispute**

In March 2022, Denise's attorney e-mailed respondents' attorney a proposed stipulation authorizing the Trust's bank to pay $4,623.82 to CHS and $1,409.80 to Denise, for "what she advanced to the jewelry appraiser."[2]  In subsequent e-mails

---

[2] Paragraph 3 of the Settlement Agreement provided that "Linda shall be responsible for obtaining appraisals by a licensed appraiser for all jewelry (21 items) previously located at the
*(Fn. is continued on the next page.)*

discussing the stipulation (in which both CHS and the parties were included), respondents' attorney requested the issue of reimbursing Denise be tabled until counsel could confer with Rob (who was out of town), and asked instead for a stipulation to pay third-party vendors only. Specifically, respondents' counsel pointed out that Denise had sent an e-mail stating she had "no issue with any legitimately incurred expenses on behalf of the trust" and proposed the parties "get CHS and Go Green paid, and when Rob returns, we can address the issue of reimbursement." Counsel added that the issue of reimbursing Denise "is not being put off indefinitely, just until my client returns and I can discuss the issues with him."

After Denise's counsel insisted on the stipulation he sent,[3] CHS replied, addressing Denise's counsel, and opined "[w]ith the email below, you've provided clear evidence that you are in fact

---

Burbank Residence and currently in Linda's possession." In the Addendum, the parties added to this paragraph: "The Parties agree that the jewelry appraisal shall be paid forthwith from Trust funds." Denise claimed the Trust did not timely pay for the appraisal and thus she personally "advanced the moneys for the invoice so that the Appraisal -- eight months after it was promised -- could finally be received."

[3] Denise's attorney later averred in a declaration that respondents' attorney "demanded that I execute a new stipulation (the 'Gonzalez Stipulation') for [the Trust's bank] Logix to pay CHS only -- in flagrant further violation of the provisions of the Settlement Agreement quoted above -- and for Denise to wait even longer for the 'forthwith' payment that her clients had failed to pay for more than half a year. Denise -- quite understandably -- instructed me not to execute the Gonzalez Stipulation."

6

holding our rightful payment hostage in a misguided attempt to coerce a reimbursement for your client, something (which I have repeatedly stated that has nothing to do with the work CHS has performed [*sic*] . . . [¶] You are also going against your client's approval of this payment, and so are not acting in your client's best interest, given that legal charges will be incurred that must be reimbursed to CHS." CHS concluded: "Because of this grossly unethical behavior on your part, I have composed a complaint to the California Bar Association that I shall put in the mail tomorrow afternoon if I do not have clear and reliable proof that the check is on its way. I've attached a photo of this complaint, lest you make the gross misjudgment that I am not a person of my word."

Denise's attorney replied that CHS had "misunderstood my client's e-mail" and that he did "not have her authorization to sign the stipulation, nor was she giving it." He also told CHS that its e-mail "constitutes extortion which is a felony." Denise replied to this e-mail with "Ditto." CHS replied, denying its e-mail constituted extortion, stating "[y]our making those threats and attempting to coerce me is also unethical," and informing Denise's attorney that it would "mail [its] complaint today." When Denise's attorney asked CHS to elaborate on the "threats" and "coer[sion] [*sic*]," CHS responded: "I think it's quite clear. My issue is with your actions as an attorney – and most certainly **not** with your client Denis[e] McMillan. [¶] We are simply seeking payment for the services we provided as a neutral third-party vendor."

Denise then replied to this e-mail stating: "As I thought was clear from my emailed 'ditto' to [my attorney] Mr. Schlaff's email to you on Friday morning, Mr. Schlaff is not now and never

was authorized to execute any stipulation for your payment other than the one which he sent to [respondents' attorney] Jamie Gonzalez weeks ago, which Ms. Gonzalez has refused to sign for specious reasons. The problem here is not with me or my attorney, but with Ms. Gonzalez and her clients (and now with you). Please stop deliberately misconstruing my words. I don't appreciate being patronized."

In later e-mails between CHS and Denise's attorney, CHS apologized for the initial e-mail it sent, confirming that it "misunderstood Denise's email sent earlier that week in which she'd said she did not object to paying for 'legitimate' services" and that "[b]ecause she was continuing to ask that CHS do things for her, I'd mistakenly assumed . . . that we were included among those 'legitimate' services." In answer to a question posed by Denise's attorney whether CHS filed the State Bar complaint, it responded that it had but "[t]heir decision was to decline moving forward with it, fortunately." Denise's attorney subsequently informed CHS that its "misconduct has caused me to expend more than forty hours of my time (for which I generally bill $650 per hour) dealing with this situation and meeting with counsel to defend me. Despite the frivolous nature of your State Bar complaint (which I only just saw), . . . I felt I had no choice but to take time away from profitable work to prepare myself for the aftermath of your bad faith complaint to the bar."[4]

### 2. The Motion

In September 2022, respondents made a motion before the referee to enforce the Settlement Agreement, alleging that

___

[4] Denise claims dealing with CHS "has collectively cost Denise and her counsel well in excess of $50,000."

8

"[p]ursuant to the terms of the Agreements, certain services were provided to the Klinger Family Trust" and "payment from the Trusts necessarily flowed therefrom." However, "Denise has refused to permit such payment and, thus, is standing in the way of effectuating the Agreements, permitting the proper administration of the Trust, and unnecessarily dragging out this litigation despite the fact that it has already been settled twice." Respondents also requested the attorneys' fees they incurred for filing the motion.

Specifically, respondents alleged Rob had advanced $16,241.28 of his personal funds to pay Trust expenses because Denise and her counsel "routinely interfered with or delayed regular administrative payments from the Trust," and Denise opposed the Trust reimbursing him for these advances. Respondents also contended Denise opposed payments to CHS for the work they performed at the Burbank Residence, and that $2,206.62 was still owing to CHS, along with $251.18 in attorneys' fees to which CHS was entitled.

### 3. The Opposition

In October 2022, Denise opposed respondents' motion, arguing neither CHS nor Rob should be paid because of their "unclean hands." For CHS, Denise cited the March 2022 e-mail CHS sent to her attorney, which she characterized as "a textbook example of extortion" and "a felony." For Rob, Denise accused him (and Linda) of breaching their fiduciary duty by failing to "pursue claims" against CHS. Denise also faulted them for bringing the motion in the first place, refusing to sign the stipulation her attorney had proposed, and not meeting and conferring. Denise additionally claimed Rob's claims for reimbursement contravened the Settlement Agreement.

9

### 4. The Reply

In their reply brief, respondents countered that the Trust had no extortion claim against CHS because any alleged extortion was aimed at Denise's counsel and not at the Trust. Respondents also asserted they had met and conferred with Denise to no avail and disputed her interpretation of the Settlement Agreement.

### 5. The Ruling

In November 2022, the referee granted the majority of respondents' requests. In her order, she noted Denise's argument that CHS was "barred from recovering the balance due from the Trust due to the doctrine of unclean hands, which is a complete defense," as well as her argument that Linda and Rob had "unclean hands" because they filed the motion, "motivated" CHS "to commit crimes and torts by not signing the original stipulation directing payment by the Trust," "violated Paragraph 2 of the Addendum to the Settlement Agreement," and "failed to meet and confer." The referee also noted respondents' counter-argument that "[t]he alleged unclean hands of CHS was directed at [Denise's attorney] Schlaff, and not at the Trust, its cotrustees, or beneficiaries" and "[t]he Trust was, in no way, affected by the alleged unclean hands of CHS."

The referee found: (1) neither the Settlement Agreement nor the Addendum required the parties to meet and confer before bringing the motion but "[t]he Parties' attorneys did communicate extensively over several months concerning Rob's requested expenditures, including at hearings with this Referee"; (2) "[t]he $16,241.28 expenditures by Rob were all documented, necessary, and appropriate expenditures of the Trust, and all benefited the Trust"; (3) "Paragraph 5 of the Settlement

10

Agreement does not prohibit Rob from being reimbursed for these payments"; (4) "[t]he language in the [CHS] email does not affect the Trust's liability to pay for services previously performed, and Denise's counsel's dispute is not for the benefit of the Trust"; (5) "CHS performed its work to the benefit of the Trust, is entitled to its contractual fees including attorneys' fees, and any further delay in payment would have increased the costs to the Trust in the form of imposition of penalties and attorneys' fees under the contract"; and (6) "[t]he sum of $2,206.62 remains to be paid to CHS for its work in clearing out the Residence." The referee further found that the Settlement Agreement permitted the awarding of attorneys' fees and that Linda and Rob reasonably incurred $15,000 in fees for bringing the motion.[5]

The referee ordered: (1) the Trust to reimburse Rob for $16,241.28 and pay CHS $2,206.62; (2) counsel for the parties to sign the necessary paperwork to effect these payments; and (3) Denise to pay Linda and Rob $15,000 for attorneys' fees. Linda and Rob's motion to separately sanction Denise was denied. The referee also did not award CHS the requested $251.18 in attorneys' fees.

Denise timely appealed.[6]

---

[5] Respondents had requested $18,542.50 in fees.

[6] (Code Civ. Proc., § 645 ["The decision of the referee appointed pursuant to Section 638 or commissioner may be excepted to and reviewed in like manner as if made by the court"]; Prob. Code, § 1300 ["In all proceedings governed by this code, an appeal may be taken from the making of, or the refusal to make, any of the following orders: [¶] (c) Authorizing, instructing, or directing a fiduciary, or approving or confirming the acts of a fiduciary. [¶] (d) Directing or allowing payment of a
*(Fn. is continued on the next page.)*

11

## DISCUSSION

Denise argues the referee erred by ordering the Trust to: (a) pay CHS even though "CHS committed extortion as a matter of law"; and (b) reimburse Rob when Rob had "unclean hands" and when such payment contravened the Settlement Agreement.[7] We address each point in turn.

---

debt, claim, or cost. [¶] (e) Fixing, authorizing, allowing, or directing payment of compensation or expenses of an attorney. [¶] (f) Fixing, directing, authorizing, or allowing payment of the compensation or expenses of a fiduciary"].)

[7] At oral argument, Denise's counsel pointed out that the $2,206.62 the referee ordered the Trust to pay CHS included $244.12 in attorneys' fees incurred by CHS and argued it was improper for the Trust to pay those fees. We find Denise forfeited this argument by failing to raise it in her opening brief. Although her counsel claimed the issue was addressed, the sole mention of the issue on the page her counsel cited was in the fact section, which stated only: "Among the documents which were submitted to the Referee for reimbursement were Exhibits '7' and '8' (8:AA1556-1558) which were copies of Heebner and CHS's purported legal fees which were apparently paid to Josslyn Stuart of the 'SMALL BUSINESS LAW FIRM, PC'. They show that those fees were incurred in connection with the sending of the Extrortionate [*sic*] Email." This brief mention is insufficient to demonstrate error. (See *Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545 [" 'an appellate brief "should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration" ' "]; *Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["We are not required to examine undeveloped claims or to supply arguments for the litigants"].)

12

## A. *The Referee Did Not Err in Ordering the Trust to Pay CHS*

Denise contends the referee "abused her discretion" (boldface and capitalization removed) in ordering the Trust to pay CHS because CHS "committed extortion as a matter of law," which purportedly provided the Trust with an "unclean hands" defense to any claim for payment CHS might make in a court of law. Additionally, Denise contends CHS's e-mail gave the Trust "a contractual cause of action against CHS" that the Trust was obligated to pursue. We disagree.

Although the referee's order does not expressly state whether she found the doctrine of unclean hands barred the relief respondents sought, we presume she found the defense inapplicable because she granted the majority of the requested relief after noting Denise had argued to the contrary, and because she found CHS's e-mail "does not affect the Trust's liability to pay for services previously performed, and Denise's counsel's dispute is not for the benefit of the Trust." (*Kaushansky v. Stonecroft Attorneys, APC* (2025) 109 Cal.App.5th 788, 799 [" 'A judgment or order of a lower court is presumed to be correct on appeal, and all intendments and presumptions are indulged in favor of its correctness' "].) We review a decision to apply (or not apply) the unclean hands defense for abuse of discretion. (*Aguayo v. Amaro* (2013) 213 Cal.App.4th 1102, 1109.)

Penal Code section 519 provides that "[f]ear, such as will constitute extortion, may be induced by a threat of any of the following: [¶] . . . [¶] 2. To accuse the individual threatened . . . of a crime. [¶] 3. To expose, or to impute to him . . . a deformity, disgrace, or crime. . . ." Citing this section, Denise argues CHS's e-mail is a "textbook example" of threatening " '[t]o accuse the

13

individual threatened . . . of a . . . deformity, disgrace, or crime.' " Even assuming CHS's threat to report Denise's attorney to the State Bar constituted a threat to accuse him of (or "expose" or "impute to" him) "a deformity, disgrace, or crime," it is debatable whether CHS "committed extortion as a matter of law" as Denise claims. (See, e.g., *Flatley v. Mauro* (2006) 39 Cal.4th 299, 332, fn. 16 ["our opinion should not be read to imply that rude, aggressive, or even belligerent prelitigation negotiations, whether verbal or written, that may include threats to file a lawsuit, report criminal behavior to authorities or publicize allegations of wrongdoing, necessarily constitute extortion"].) Additionally, even if CHS committed extortion, it is unclear CHS committed extortion *against the Trust*.

But, assuming arguendo that CHS did commit extortion against the Trust, unclean hands is an equitable defense. "The defense of unclean hands does not apply in every instance where the plaintiff has committed some misconduct in connection with the matter in controversy, but applies only where it would be inequitable to grant the plaintiff *any* relief." (*Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 446–447.) "The court must consider both the degree of harm caused by the plaintiff's misconduct and the extent of the plaintiff's alleged damages." (*Id.* at p. 447.) "The decision of whether to apply the defense based on the facts is a matter within the trial court's discretion" and a "court's discretion to grant an equitable defense such as unclean hands is not unlimited." (*Ibid.*)

" 'An abuse of discretion occurs only where it is shown that the trial court exceeded the bounds of reason. [Citation.] It is a deferential standard of review that requires us to uphold the trial court's determination, even if we disagree with it, so long as it is

14

reasonable.' " (*Blueberry Properties, LLC v. Chow* (2014) 230 Cal.App.4th 1017, 1020.)

Here, there is no evidence in the record that CHS's threat adversely affected the Trust such that it would be equitable to deny payment to CHS.  To the extent Denise's attorney contends he was forced to incur fees to deal with an anticipated State Bar investigation, or Denise contends those fees were passed on to her, those are not claims the Trust can pursue against CHS. Nothing in the record demonstrates the *Trust* was obligated to pay any such fees.  In these circumstances, we cannot conclude the referee exceeded the bounds of reason in declining to apply an unclean hands defense to preclude payment from the Trust to CHS for services rendered.

**B.** ***The Referee Did Not Err in Ordering the Trust to Reimburse Rob***

### 1. The Doctrine of Unclean Hands Does Not Bar Reimbursement

Denise argues Rob's hands were "unclean" for four reasons: (a) Linda and Rob brought the motion Denise was opposing in violation of their fiduciary duties to Denise as a co-beneficiary; (b) Linda and Rob "motivated" CHS's extortion by refusing to sign the stipulation proposed by Denise's counsel; (c) Rob "secretly authorized and paid CHS" in violation of paragraph 2 of the Addendum; and (d) Linda and Rob initially failed to meet and confer about paying CHS and then, after doing so, "deliberately misrepresented to the Referee the basis for Denise's objections to further payments going to CHS."

First, as discussed above, the defense of unclean hands is an equitable one, and the referee had discretion to not apply it.

15

Given the circumstances discerned from the record, we do not conclude the referee abused her discretion in declining to do so.

In any case, Denise provides no authority that Linda and Rob's motion was a breach of fiduciary duty under these circumstances—indeed, in seeking to pay CHS for services rendered, Linda and Rob were attempting to protect the Trust from further legal liability for unpaid bills. There is no evidence CHS was "motivated" by Linda and Rob's refusal to sign the stipulation proposed by Denise's counsel—CHS was clear in its e-email that it was "motivated" by the refusal of Denise's attorney to sign the stipulation sent by Linda and Rob's attorney, which would have authorized payment to CHS without involving the issue of reimbursement to Denise.[8] Inasmuch as the Addendum expressly stated CHS would be performing a "clean out process" at the Burbank Residence and Rob was responsible for the initial communications with CHS, Rob's authorization to CHS to perform work was not done in "secret" or done unilaterally. And Denise fails to specify what misrepresentations Linda and Rob made to the referee, or what impact those representations had on the referee's decision. We conclude the referee did not abuse her discretion by declining to use the unclean hands defense to preclude payment to Rob.

---

[8] Denise herself admits, the stipulation sent by her counsel directed the Trust's bank to not only "pay CHS its purportedly outstanding bill" but also to "pay the jewelry appraisal moneys which her clients had already agreed in writing to being paid 'forthwith' " from the bank account. Whereas the stipulation offered by respondents' counsel would "pay CHS only."

16

### 2. The Settlement Agreement Does Not Bar Reimbursement

Finally, Denise argues that "Paragraph 5 and 6's definitive statements in the Initial Settlement Agreement as to the exact amount of money Rob would be receiving, as well as its specification of how the parties were to meet and confer concerning the issuance of checks in the future, on the one hand, compared with the settlement agreements' absolute silence as to future reimbursements of undisclosed, unconsented to trust expenditures requires the agreements to be interpreted as forbidding such expenditures." Although the court did not discuss paragraph 6, it found paragraph 5 did not preclude Rob's reimbursement request. "The interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence." (*Morgan v. City of L.A. Bd. of Pension Comrs.* (2000) 85 Cal.App.4th 836, 843.)

Paragraph 5 of the Settlement Agreement provided that Rob would "receive reimbursement from the Trust for Trust expenditures that he personally paid out of pocket on behalf of the Trust in the amount of $60,931" and that he "shall be reimbursed for these expenses prior to the distributions of any sums of Trust residue to any Party." Paragraph 6 provided that Rob would "receive trustee fees in the amount of $70,500" and "[n]o other Party shall receive any trustee fees." Neither paragraph precluded reimbursements for expenses occurring after the date of the agreement. Paragraph 5 dealt only with reimbursement for expenses that Rob had "personally *paid*" (italics added) at the time the agreement was entered, not expenses that he would later pay. Paragraph 6 dealt only with trustee fees, not expense reimbursement.

17

Moreover, paragraph 2 of the Addendum provided that "the Parties agree that the Burbank Residence shall be cleaned out as soon as Clear Home Solutions is able to begin the clean out process" and that "Rob shall be initially responsible for setting up the clean out." Therefore, the parties expressly agreed the Trust would use CHS to "clean out" the Burbank Residence. There was no suggestion that CHS would be donating its services, and such an assumption would be absurd. Additionally, it is clear from the agreements that the parties contemplated the Trust would incur other expenses after the execution of the Settlement Agreement: paragraph 8 of the Settlement Agreement provided that the Parties would "keep a reserve of $10,000 to be used for Trust accounting fees . . . and any other remaining Trust administration expenses," and paragraph 5 of the Addendum provided a procedure by which a Trustee could issue a check to pay for such expenses. Thus, while the agreement did not expressly state the Trust would pay CHS for its services, such an interpretation is the only reasonable one. "[A] contract is to be interpreted as a whole, giving effect to every part [citations], thereby avoiding an absurd construction." (*Foreman Roofing v. United Union of Roofers Etc. Workers* (1983) 144 Cal.App.3d 99, 107.)

On this record, we conclude the referee did not err in ordering the Trust to reimburse Rob and pay CHS. Because Denise does not contest the referee's attorneys' fees order—except to the extent that she contends Linda and Rob should not have prevailed on their motion at all, an argument we reject—we also conclude the referee did not err in ordering Denise to pay Linda and Rob $15,000 in attorneys' fees.

18

**DISPOSITION**

The referee's order is affirmed. Respondents are the prevailing parties in this appeal for purposes of attorneys' fees and are awarded their costs on appeal.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.